712 A.2d 634

PFIZER, INC., PLAINTIFF–RESPONDENT, v. EMPLOYERS IN- SURANCE OF WAUSAU, A MUTUAL COMPANY, ALLSTATE INSURANCE COMPANY, NORTHBROOK INDEMNITY COMPA- NY, AMERICAN HOME ASSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, INSURANCE COMPANY OF PENNSYLVANIA, NATIONAL UNION FIRE INSURANCE COMPANY, CONTINENTAL INSURANCE COMPANY, FIDELI- TY & CASUALTY COMPANY OF NEW YORK, PACIFIC INSUR- ANCE COMPANY, CONTINENTAL CASUALTY COMPANY, BRITAMCO LTD., FORUM INSURANCE COMPANY, GOVERN- MENT EMPLOYEES INSURANCE COMPANY, INTERNATION- AL INSURANCE COMPANY, PRUDENTIAL REINSURANCE COMPANY, ROYAL INDEMNITY INSURANCE COMPANY, TRANSAMERICA INSURANCE COMPANY, UNIGARD SECURI- TY INSURANCE COMPANY, ARKWRIGHT INSURANCE COM- PANY, ST. PAUL FIRE & MARINE INSURANCE COMPANY, NORTHWESTERN NATIONAL INSURANCE COMPANY, MA- RINE OFFICE OF AMERICA CORPORATION, AND JOHN DOES 1–10, DEFENDANTS, AND COMMERCIAL UNION IN- SURANCE COMPANY, THE HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, CERTAIN UN-

DERWRITERS OF LLOYD'S, LONDON AND THE LONDON MARKET COMPANIES, CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, C.E. HEATH COMPENSATION & LIABILITY INSURANCE COMPANY, HIGHLANDS INSURANCE COMPANY AND CITY INSURANCE COMPANY, DEFENDANTS–APPELLANTS.

Argued December 1, 1997—Decided June 11, 1998.

*Paul R. Koepff,* a member of the New York bar, argued the cause for appellants Commercial Union Insurance Company, Insurance Company of North America, Century Indemnity Company as successor to CCI Insurance Company, as successor to INA, Alan Lloyd, on his own behalf and as a representative for Certain Underwriters of Lloyd's, London and Certain London Market Companies, Central National Insurance Company of Omaha with respect to policies issued through Cravens, Dargan & Company, Pacific Coast, as their Managing General Agent, C.E. Heath Compensation & Liability Insurance Company, Highlands Insurance Company with respect to policies issued through Cravens, Dargan & Company, Pacific Coast, as their Managing General Agent (*Graham, Curtin & Sheridan,* attorneys for Insurance Company of North America, Century Indemnity Company as successor to CCI Insurance Company, as successor to INA, Highlands Insurance Company with respect to policies issued through Cravens, Dargan & Company, Pacific Coast, as their Managing General Agent, Central National Insurance Company of Omaha with respect to policies issued through Cravens, Dargan & Company, Pacific Coast, as their Managing General Agent, *Christie, Pabarue, Mortensen and Young* attorneys for Commercial Union Insurance Company and C.E. Heath Compensation & Liability Insurance Company and *Margolis Edelstein* attorneys for Alan Lloyd, on his own behalf and as a representative for Certain Underwriters of Lloyd's, London and Certain London Market Companies; *Mr. Koepff, Joseph R. McDonough, James W. Christie, III, Arthur J. Liederman,* a member of the New York bar, and *Bruce E. Barrett* on the brief).

*Jerrald J. Hochman* submitted a brief on behalf of appellants The Home Insurance Company and The City Insurance Company (*Sheft, Golub & Kamlet,* attorneys).

*Andrew T. Berry* argued the cause for respondent (*Killian & Salisbury* and *McCarter & English,* attorneys; *Eugene Killian, Jr., Jerold Oshinsky,* a member of the District of Columbia bar, *Edward Tessler* and *Lynda A. Bennett,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This is a multisite, multistate, environmental insurance coverage case. We granted leave to appeal in this action and in *HM Holdings, Inc. v. Aetna Casualty & Surety Co.*, 154 *N.J.* 208, 712 *A.*2d 645 (1998), and *Unisys Corp. v. Insurance Co. of North America*, 154 *N.J.* 217, 712 *A.*2d 649 (1998), also decided today, to consider the choice of law governing the interpretation of the casualty-insurance contracts that provide indemnity against pollution-damage claims.

> Choice of law with respect to interpreting insurance contracts develops a life of its own when considered in the context of hazardous waste sites. Because of the public's heightened sensitivity to environmental pollution in the last quarter century and because of the significant costs associated with these coverage disputes, a "virtual avalanche of coverage litigation between carriers and their policyholders has ensued to determine who may be ultimately responsible for the payment of these costs." At the very core of these disputes, which have spawned hundreds of reported cases nationwide, is the interpretation to be accorded certain contractual language contained in comprehensive general liability (CGL) policies.
>
> [*In re Combustion, Inc.*, 960 *F.Supp.* 1056, 1062 (W.D.La.1997) (citations omitted).]

The appeals require us to apply the principles of *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Insurance Co.*, 134 *N.J.* 96, 629 *A.*2d 885 (1993). In *Spruance*, we held that choice-of-law determinations in interpreting casualty-insurance contracts should be made by looking first to section 193 of the *Restatement (Second) of Conflict of Laws* (1971) (*Restatement*). That section provides that the law of the principal location of the insured risk governs unless another state has a more significant relationship to the parties and the transaction under the principles stated in *Restatement* section 6. The principles are best understood in the context of the specific cases.

I

In this declaratory judgment action, Pfizer seeks coverage for environmental contamination liability claims that have arisen at some ninety separate sites in nineteen states and in Puerto Rico. Twenty-four of the sites are located in New Jersey. (We have not

made any factual findings concerning Pfizer's allegations but merely set forth principles of law based on the facts asserted.) Pfizer sought this relief under comprehensive general liability (CGL) policies and environmental impairment liability policies issued by the various defendants. In earlier rulings, the trial court had determined that New Jersey law would govern the litigation pertaining to five New Jersey sites and one Rhode Island site. The trial court had also determined that New Jersey law would apply to certain other legal issues in the case. This appeal presents choice-of-law issues concerning six sites in other states—two in Pennsylvania and one each in Massachusetts, North Carolina, Connecticut and Indiana. None of the sites received any waste generated in New Jersey by Pfizer. The issues before us are (1) what law guides the interpretation of the pollution-exclusion clause in the CGL policies and (2) what law governs the validity of late-notice defenses. The insurance companies contended that with respect to the non-New Jersey sites either New York law, the place of Pfizer's headquarters, or the law of the sites—that is, the law of the state in which each site was located—should control. Pfizer argued that the law of a single jurisdiction, that of New Jersey, should apply to all the sites. The trial court agreed with Pfizer.

Applying the *Spruance* principles, the trial court found that when an operation is predictably multistate, as was Pfizer's, the significance of the principal location of the insured risk diminishes. In that instance, the court reasoned that in accordance with section 6 of the *Restatement*, the governing law should be the law of the state with the dominant significant relationship to the disputed issue. The court found that New Jersey has a commitment to "protecting its insureds through liberal insurance coverage." After contrasting the law of other states with New Jersey's law concerning interpretation of the pollution-exclusion clause and the late-notice defense, the court observed that Pfizer had been authorized to do business in New Jersey since 1900 and employed 2,200 New Jersey residents at six State locations, and that an additional 500 New Jersey residents work at Pfizer's New York

headquarters. The company shipped some $375 million worth of products and services from New Jersey in 1993 and expended $31 million for research and development in that year. Four of the insurance companies were either incorporated or had their principal place of business in New Jersey. The court held that New Jersey law should apply, reasoning that "New Jersey has an interest in protecting its businesses through the application of its laws" and that "[f]ailure to apply New Jersey law to the pollution exclusion and the notice issues would frustrate significant New Jersey public policies."

We granted leave to appeal, 150 *N.J.* 20, 695 *A.*2d 664 (1997), to consider the arguments of the insurance companies.

## II

### A.

At an earlier time, choice-of-law rules were relatively simple and easy to apply. Under the doctrines of *lex loci contractus* and *lex loci delicti*, the contract laws of the place where a contract was made would govern contract disputes, and the tort laws of the place where an accident happened would control in tort cases. Over time, those rules gave way to more complex analysis.

The several states now have differing choice-of-law rules. Among the rules used are the most-significant-relationship test, *People v. Saiken*, 49 *Ill.*2d 504, 275 *N.E.*2d 381 (1971), *cert. denied*, 405 *U.S.* 1066, 92 *S.Ct.* 1499, 31 *L. Ed.*2d 796 (1972); the governmental-interest test, *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 *Cal.App.*4th 637, 17 *Cal.Rptr.*2d 713 (1993); the law of the forum, *Joy Techs., Inc. v. Liberty Mut. Ins. Co.*, 187 *W.Va.* 742, 421 *S.E.*2d 493 (1992); and the place of contracting, *American Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 *Md.* 560, 659 *A.*2d 1295 (1995). New Jersey had long rejected "the mechanical and inflexible *lex loci contractus* rule in resolving conflict-of-law issues in liability-insurance contracts. Instead, our courts have adopted a more flexible approach that focuses on the state

that has the most significant connections with the parties and the transaction." *Spruance, supra,* 134 *N.J.* at 102, 629 *A.*2d 885. New Jersey courts seek to apply the law of the state with the greatest interest in resolving the particular issue that is raised. *Gantes v. Kason Corp.,* 145 *N.J.* 478, 484, 679 *A.*2d 106 (1996) (citing *Veazey v. Doremus,* 103 *N.J.* 244, 247–49, 510 *A.*2d 1187 (1986); *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 *N.J.* 28, 36–37, 417 *A.*2d 488 (1980); and *O'Keeffe v. Snyder,* 83 *N.J.* 478, 490, 416 *A.*2d 862 (1980)).

Prior to this Court's decision in *Spruance,* the principal analytical choice in multisite environmental coverage cases had been between cases holding that one law governs the insurance contract regardless of the location of the insured risk—the "uniform-contract-interpretation approach"—and cases that emphasize the location of the insured risk and apply the law of that state unless another state has a more significant relationship with regard to the contested issue—"the site-specific approach." *See Spruance, supra,* 134 *N.J.* at 103–11, 629 *A.*2d 885; Symeon C. Symeonides, *Choice of Law in the American Courts in 1995: A Year in Review,* 44 *Am. J. Comp. L.* 181, 230 (Spring 1996).

In *Westinghouse Electric Corp. v. Liberty Mutual Insurance Co.,* 233 *N.J.Super.* 463, 559 *A.*2d 435 (1989), the Appellate Division adopted the uniform-contract-interpretation approach. In *Spruance, supra,* the Court adopted a "site-specific" approach that emphasizes the location of the site of the risk. 134 *N.J.* at 112, 629 *A.*2d 885. At first, some believed that *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 *N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied,* 512 *U.S.* 1245, 114 *S.Ct.* 2764, 129 *L. Ed.*2d 878 (1994), might require New Jersey courts to apply New Jersey's law on the pollution-exclusion clause irrespective of the location of specific sites. However,

New Jersey courts have rejected efforts to base the choice of law determination upon New Jersey's perceived interest in broadly applying the regulatory estoppel holding set forth in *Morton* to environmental coverage disputes or upon a mechanical application of the law where the site is located. Instead of applying either of these automatic rules, the choice of law determination must reflect a careful site-

specific determination, made upon a complete record, of the factors set forth in either section 193 (principal location of the insured risk) or section 6 (identification of state with dominant significant relationship) of the *Restatement (Second) of Conflict of Laws.*

[Michael Misch, et al., *Recent Developments in Insurance Coverage Issues,* 31 *Tort & Ins. L.J.* 335, 336 (Winter 1996) (hereinafter, Misch).[1]]

## B.

At the risk of repetition, we summarize the *Spruance* analysis. Although *Restatement* section 188 sets forth the general rule governing choice of law in contract actions,[2] *Spruance* set forth a specific choice-of-law framework for interpreting casualty-insurance contracts. Under this framework, a court looks first to *Restatement* section 193, which provides that the place that "the parties understood . . . to be the principal location of the insured

---

[1] Among the cases cited by the author were *Waste Management, Inc. v. Admiral Insurance Co.,* 138 *N.J.* 106, 649 *A.2d* 379 (1994), *cert. denied sub nom. WMX Technologies, Inc. v. Canadian General Insurance Co.,* 513 *U.S.* 1183, 115 *S.Ct.* 1175, 130 *L.Ed.*2d 1128 (1995), *CBS, Inc. v. Crum & Forster,* No. AM–712–94T2 (App.Div. Mar. 27, 1995), and *Seton Co. v. Birmingham Fire Insurance Co.,* No. AM–974–94T2 (App.Div. May 18, 1995).

[2] According to *Restatement* section 188, the general rule in contract actions is that the governing law is that of the state with the most significant relationship to the parties and the transaction under the principles stated in *Restatement* section 6 governs. *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 *N.J.* 28, 34, 417 *A.2d* 488 (1980). Section 188 lists several relevant "contacts," according to their relative importance, to be considered in the section 6 analysis, such as the domicile, residence, nationality, place of incorporation and place of business of the parties, and the places of contracting and performance. Under section 6, the "general considerations germane to a court's conflict-of-law analysis" are:

(a) the needs of the interstate and international system,
(b) the relevant policies of the forum,
(c) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

[*Restatement* § 6.]

risk governs unless some other state has a more significant relationship under the principles stated in [section] 6 to the transaction and the parties." *Spruance, supra,* 134 *N.J.* at 112, 629 *A.*2d 885 (quoting *Restatement* § 193). When the policy covers risks located primarily in a single state, "the choice-of-law issue can be straightforward. For example, there is no choice-of-law issue where the policyholder is located in one state, the environmental liability arises out of the same state, and the policies are issued by a state-based insurer for that one site." *In re Combustion, supra,* 960 *F.Supp.* at 1062; *accord Restatement* § 193, comment b. An easy example is that of a CGL policy covering a solid waste treatment plant creating a risk in a single state. "At the other end of the spectrum are cases where a single insured seeks coverage under CGL policies for certain environmental and toxic tort liabilities, including ... [multiple] sites located in ... different states." *In re Combustion, supra,* 960 *F.Supp.* at 1062. When such an insured operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes; in such a case, section 193 directs that "the governing law is that of the state with the dominant significant relationship according to the principles set forth in *Restatement* section 6" as applied to "the particular issue involved." *Spruance, supra,* 134 *N.J.* at 112, 629 *A.*2d 885.[3] The site-specific approach of section 193 inevitably means that more than one state's law may govern coverage questions arising under a casualty insurance policy. *Restatement* section 193, comment f, addresses the problems encountered

> when an insurance policy insures multiple risks located in different states which by statute require specific forms of insuring clauses. In such a case, the single policy insuring multiple risks will usually incorporate the statutorily-mandated forms of the states involved, and the courts will, presumably, treat the policy as involving separate policies, each insuring an individual risk.

---

[3] We pause to note our concurrence with the sound observation of Chief Judge Becker in *NL Industries, Inc. v. Commercial Union Insurance Co.,* 65 *F.*3d 314 (3d Cir.1995), that the *Spruance* principles may not be readily transferable from environmental-coverage cases to products-liability cases.

[*The Rouse Co. v. Federal Ins. Co.*, 991 *F.Supp.* 460, 463 (D.Md.1998).]

## C.

*Spruance* used the "site-specific" analysis to determine what law governed the duty to indemnify for hazardous waste produced in Pennsylvania by a Pennsylvania company that came to rest at a New Jersey site. The *Spruance* Court thus agreed with the Appellate Division that New Jersey courts should interpret a pollution-exclusion clause contained in a CGL policy that was purchased to cover an operation or activity according to New Jersey substantive law, without regard to the place the contract was made or the location at which the toxic wastes that predictably come to rest in New Jersey were generated. In such a case, New Jersey has the dominant and significant relationship with the parties, the transaction, and the outcome of the controversy. *Gilbert Spruance Co. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 254 *N.J.Super.* 43, 603 *A.*2d 61 (App.Div.1992), *aff'd,* 134 *N.J.* 96, 629 *A.*2d 885 (1993).

The *Spruance* Court approved the holding in a factually similar case, *Leksi, Inc. v. Federal Insurance Co.*, 736 *F.Supp.* 1331 (D.N.J.1990). The *Leksi* court had held that "in the absence of a choice of law provision [in the contract], the state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there." *Id.* at 1336. Although *Spruance, supra*, accepted *Leksi*'s section 6 analysis to determine that when "out-of-state generated waste foreseeably comes to rest in New Jersey, New Jersey has the dominant significant relationship," 134 *N.J.* at 113, 629 *A.*2d 885, *Spruance* expressly declined to state that its holding would apply to the converse situation in which waste generated in New Jersey was predictably disposed of in another state, *ibid.* (*Spruance* was essentially a two-state, single-site case.) Noting that the *Leksi* court had enunciated an unqualified "bright-line" rule calling for the application of law of the state of the waste location and that another court had called for an analysis under

section 6, *Spruance* chose to "express no view on [either] proposition." *Id.* at 113–14, 629 *A.*2d 885.

Courts have found it "tempting" to extract from *Spruance* a "bright-line rule" of applying the law of the state in which the waste disposal site is located as long as it was reasonably foreseeable to the contracting parties that the insured's waste would predictably come to rest in that state. *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 *F.*3d 647 (3d Cir.1995) (determining whether New Jersey or Pennsylvania laws should govern interpretation of pollution-exclusion clause when New Jersey company shipped waste to Pennsylvania). Such a bright-line rule would be attractive, not only because of its simplicity but because of its "surface level" appearance of fairness. *Id.* at 655. However, *Ceramics* rejected this rule because *Spruance* had specifically refused to adopt it and because such a rule would defeat New Jersey's policies without furthering the "Pennsylvania policy reasons for giving [the pollution-exclusion clause] its literal meaning." *Ibid.; see also J. Josephson, Inc. v. Crum & Forster Ins. Co.,* 293 *N.J.Super.* 170, 186, 679 *A.*2d 1206 (App.Div.1996) (relying on *Spruance* and *Ceramics* to conclude that New Jersey law governed coverage issues when New Jersey insured deposited waste in Pennsylvania).

Although the process is demanding, there is no way to avoid a "careful site-specific determination, made upon a complete record." Misch, *supra,* 31 *Tort & Indus. L.J.* at 336. In each of these cases before us, the risks insured, like the risk in *Spruance,* were "to some degree transient." *Spruance, supra,* 134 *N.J.* at 113, 629 *A.*2d 885 (quoting *A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 741 *F.Supp.* 298, 301 (D.Mass.1990), *aff'd,* 933 *F.*2d 66 (1st Cir.1991)). Accordingly, in order to choose the applicable law that governs the disputed issues, *Spruance* requires that we turn to the section 6 analysis.

### D.

In its well-reasoned opinion in *Ceramics, supra,* the Third Circuit suggested grouping the relevant factors listed in *Restate-*

*ment* section 6 under five different categories of interest, which it described as (1) the competing interests of the relevant states, (2) the national interests of commerce among the several states, (3) the interests of the parties, (4) the interests underlying the contract law, and (5) the interests of judicial administration. 66 *F*.3d at 656. Because contract law is largely private law, we believe that factors (3) and (4) can be combined into one factor. We consider each of the factors separately.

1. *The competing interests of the states* require courts to consider whether application of a competing state's law under the circumstances of the case "will advance the policies that the law was intended to promote." *Ibid.* The "law" can be either the decisional or statutory law of a state. The focus of this inquiry should be on "what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation." *Ibid.* This is another way of saying that "[i]f a state's contacts [with the transaction] are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." *Veazey, supra,* 103 *N.J.* at 248, 510 *A*.2d 1187 (citation omitted). Thus, if a state statute regulating the late-notice defense required a showing of prejudice before invocation of the defense, a court should consider when that legislature would have an interest in having its law apply and when its purposes in adopting the late-notice requirement would be served by applying the law to the case.

2. *The interests of commerce among the states* require courts to consider whether application of a competing state's law would frustrate the policies of other states. Using the example of a late-notice defense, if a competing state's law did not require prejudice, a conflict between the states' interests is created. Can the law of one state be disregarded without offense to its purposes?

3. *The interests of parties* require courts to focus on their justified expectations and their needs for predictability of result. These are basic purposes of contract law, especially insurance law. *See Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597, 612–13, 503 *A.*2d 862 (1986); *see also Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961) ("When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations."). *Restatement* section 188 "contacts" with the states, the domicile or residence of the parties, and places of incorporation, business, contracting, and performance, come into play here in assessing what parties might reasonably have expected to be predictable.

4. *The interests of judicial administration* require a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen. In other words, what choice of law works best to manage adjudication of the controversy before the court. Environmental insurance coverage cases tend to be extraordinarily complex, with multiple parties and multiple issues. Efficient administration of such cases is an important factor to consider.

## III

### A.

#### What law governs interpretation of the pollution-exclusion clause?

We begin with the obvious. "A court has to make a choice of law decision in an actual case only (1) when the case is connected with more than one state, and more importantly, (2) when the laws of the involved states differ on the point in issue." Robert A. Sedler, *A Real World Perspective on Choice of Law*, 48 *Mercer L.Rev.* 781, 783 (Winter 1997). This case is plainly connected with more than one state. The "point in issue" is what state's law governs the interpretation of the pollution-exclusion clause.

Three states are involved—New Jersey (the law of the forum), New York (the law of the place of making of the contract and the headquarters of Pfizer), and each of the states where the waste has come to rest (the waste sites). In *Morton, supra,* we were asked to interpret the "sudden and accidental" exceptions to the pollution exclusion clause. 134 *N.J.* at 28, 629 *A.*2d 831. That exclusion bars claims arising out of pollution events, unless the discharge of contaminants was both sudden and accidental. Insurers asserted that the term "sudden" could not be stripped of its temporal element. Thus, the insured must show that the pollution occurred abruptly. In contrast, parties seeking coverage contended that "sudden" meant only "unexpected," thereby providing coverage for instances of gradual pollution. Although agreeing with the insurer's position on the plain meaning of the terms in the exclusion, we declined to enforce the exclusion as written. *Id.* at 29, 629 *A.*2d 831. We concluded that the insurance industry misled the State insurance department that approved the exclusion. *Ibid.* The Court held that the exclusion should be interpreted to provide identical coverage to that provided under prior occurrence-based policies, but declined to extend coverage to those cases in which the insured intentionally discharged known contaminants. *Id.* at 30–31, 629 *A.*2d 831.

New York has a contrary view. It does not interpret the exception to afford liability coverage for gradual discharges. According to the insurance companies, New York's law on the point in issue was embodied in (1) a New York insurance statute that once mandated the inclusion of a pollution-exclusion clause in insurance policies, *N.Y. Ins. Law* § 46(13) & (14) (McKinney 1971), (2) New York Insurance Department directives that the statute applied to sites located outside of New York, and (3) other executive pronouncements, including speeches and comments by then Governor Nelson A. Rockefeller. The insurance companies cite decisions of federal and state courts holding that in New York there is no coverage for polluters. *See, e.g., New York v. AMRO Realty Corp.,* 936 *F.*2d 1420, 1427 (2d Cir.1991); *Ogden Corp. v. Travelers Indem. Co.,* 924 *F.*2d 39, 42 (2d Cir.1991); *Powers*

*Chemco, Inc. v. Federal Ins. Co.*, 74 *N.Y.*2d 910, 549 *N.Y.S.*2d 650, 548 *N.E.*2d 1301 (1989); *Technicon Elecs. Corp. v. American Home Assurance Co.*, 74 *N.Y.*2d 66, 544 *N.Y.S.*2d 531, 542 *N.E.*2d· 1048 (N.Y.1989); *Borg–Warner Corp. v. Insurance Co. of N. Am.*, 174 *A.D.*2d 24, 577 *N.Y.S.*2d 953, 956 (citing to "New York's. unique policy-based interest in the pollution exclusion clause"), *leave to appeal denied,* 80 *N.Y.*2d 753, 587 *N.Y.S.*2d 905, 600 *N.E.*2d 632 (1992).[4]

Although there are variations on these views, we may assume that the laws of the waste sites will be similar to either New York law of New Jersey law in that the exclusion will either be operative or inoperative. We will therefore initially apply the section 6 factors to New Jersey and New York law.

With respect to the first factor, *Spruance, supra,* had identified the purposes of New Jersey's law concerning the interpretation of the pollution-exclusion clause as New Jersey's interest in securing financial resources, both to remediate New Jersey toxic waste sites and to compensate victims of pollution in New Jersey. 134 *N.J.* at 100–01, 629 *A.*2d 885. Those purposes are not implicated in this aspect of the case concerning out-of-state waste sites. *Morton, supra,* identified as purposes of its law New Jersey's interest in protecting the "objectively reasonable expectations" of New Jersey policyholders, 134 *N.J.* ,at 30, 629 *A.*2d 831, and in deterring "misrepresentation and non-disclosure [by insurance companies] to state regulatory authorities," *id.* at 74, 629 *A.*2d 831. We do not perceive New Jersey's "wholly domestic concerns," *Ceramics, supra,* 66 *F.*3d at 656, to be significantly advanced when its "law" concerning interpretation of the pollution-exclusion clause is applied to a dispute involving policyholders from another state and waste sites in yet others. *See Waste Management, Inc. v. Admiral Ins. Co.*, 138 *N.J.* 106, 129, 649 *A.*2d 379 (1994) (finding diminished New Jersey interest when claimants "are all nonresidents seeking coverage for environmental damage occurring be-

---

4 In 1982, New York amended its laws to allow coverage of pollution damages.

yond New Jersey's borders"), *cert. denied sub nom. WMX Techs., Inc. v. Canadian Gen. Ins. Co.,* 513 *U.S.* 1183, 115 *S.Ct.* 1175, 130 *L. Ed.*2d 1128 (1995).

In contrast, the laws of New York or of the waste sites in this case bears a closer relationship to the goals underpinning those laws. New York is the principal place of business of Pfizer. The insurance contracts were negotiated there. Because the purpose of the New York rule was in part to discourage the provision of insurance against pollution, the rule's purpose would be served by its application. In addition, the states in which the waste has come to rest would have their laws rather than New Jersey's more fully advanced if applied to the matter in issue.

Concerning factor two, application of New Jersey's conflicting view of the pollution-exclusion clause would hinder the interests of commerce among the several states if that law were to be applied to determine a dispute with which New Jersey did not have a dominant and significant relationship. We do not find it "offensive or repugnant," *State Farm, supra,* 84 *N.J.* at 41, 417 *A.*2d 488, to New Jersey's public policy that another state, such as Indiana, might, in connection with waste sites and policyholders located there, give a literal meaning to the pollution-exclusion clause. Conversely, if New York law were applied to determine coverage at a waste site in Indiana and that state's law mirrored the law of *Spruance* and *Morton,* the interests of Indiana would be hindered.

Concerning factor three, because *Spruance* rejected both the uniform-contract-interpretation approach and the bright-line approach of choosing the law of either the state of waste generation or waste disposal, courts have concluded that the New Jersey Supreme Court "favors a government-interest sensitive approach over a predictable one." *NL Industries, Inc. v. Commercial Union Ins. Cos.,* 926 *F.Supp.* 1213, 1232 (D.N.J.1996). It is not that we favor governmental interests over private interests, but rather that unpredictability lies in the nature of the insurance contracts. "Predictability appears to be a minor virtue in view of the willingness of insurers to issue multi-site policies that will be

subject to the unpredictable substantive law of many states fixing the liabilities of their insureds." *Johnson Matthey Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 250 *N.J.Super.* 51, 59, 593 *A.*2d 367 (App.Div.1991). It is likely that the parties could have contracted for more predictable results had they inserted choice-of-law provisions in the insurance contracts. *Ibid.* That the parties did not do so indicates that there would be uncertainty with respect to the interpretation of the CGL clauses in various states where the policies might provide coverage. The absence of choice-of-law clauses in the policies has been described to us as the understandable effect of market forces. If the policies were to contain choice-of-law provisions the policies might not be as readily marketable, in certain states, either because of objections on the part of regulators or consumers. That does not mean that we may or should disregard the fair expectations of the parties in the predictability of a result.

Certainly in this case the interests of fair expectation and predictability of result do not favor application of New Jersey law. Given that the policies were purchased, paid for, and maintained at the principal office of Pfizer in New York, it could hardly have been predictable that New Jersey law would govern the interpretation of coverage issues in Illinois or Pennsylvania. Conversely, in the absence of a choice-of-law provision, a policyholder would expect that it would be indemnified under the law in effect at the place where liability is imposed. The policies contain sweeping declarations of coverage that should be given effect where the risks arise.

Finally, we must consider the concerns of judicial administration. In colloquy in a companion case, the trial court expressed concern that judicial administration would be hampered by requiring a jury to consider, under different standards of law, the application of the facts to the differing law at each of several waste sites. The court, in *Unisys,* said:

> I must tell you in all honesty I am not a great fan of the site specific [approach] because I think that this is a situation where facts in life have outweighed the development of traditional Anglo American common law concepts. We are ill-

equipped to deal with these sorts of situations. The idea of impanelling a jury from Middlesex County and suggesting to them that we're going to try six sites and then charge them the law, assuming that I can figure it out . . . correctly, of Montana, California, Kentucky, that frankly in a practical sense is just so unworkable that unless I was [forced to] I would never do it.

The trial court's concerns over jury management should be considerably eased by the Court's decision in *Ciba–Geigy Corp. v. Liberty Mutual Insurance Co.*, 144 *N.J.* 372, 676 *A.*2d 1089 (1996), which permits, in certain circumstances, non-jury trials in environmental pollution insurance coverage cases.

> The mere existence of factual issues does not automatically entitle a party to a jury trial. Here, for example, a central point of dispute in both *Ciba–Geigy* and *GEI* is whether the insureds intended the environmental contamination within the meaning of the underlying policies. The right to a jury that otherwise might attach to those claims must yield to the resolution of the dominant equitable issues in a non-jury trial.
>
> [*In re Environmental Insurance Declaratory Judgment Actions,* 149 *N.J.*· 278, 301, 693 *A.*2d 844 (1997).]

Although we do not minimize the difficulties encountered by a court that must analyze the pollution-exclusion laws of each of the states involved in multistate environmental coverage cases, we suspect that the laws will fall into categories or groups that the court can apply to the several factual circumstances as they develop. As counsel stated, the clause will normally be found "either unambiguous and operative or ambiguous and not operative."

In addition, as a practical matter, we may expect (and the parties suggest this) that the proofs will be different at each of several waste sites involved. For example, the nature of the operations in Indiana may have been entirely different from the nature of the operations in Pennsylvania or Massachusetts. The question of the extent to which company officials and plant operators would have known that their activities would cause environmental pollution may be expected to be quite different. *See* Tim O'Brien, *Cleanup Coverage Case Costs Carriers $400M,* 151 *N.J.L.J.* 461 (Feb. 2, 1998). Hence, there is little way in which to avoid separate trials at the separate sites. This does not mean, however, that there will be separate trials over each site. The

sites at issue here are referred to as "Phase I" or "test" sites. In a companion case, counsel for an insurance company suggested that normally the lead sites are contested first and once the major issues are resolved the rest fall in place. Counsel said, "all of our clients would shoot us if we tried 100 sites." We are told that these cases are "almost always" in mediation. We have said that "[s]uch disputes seem ideally suited for mediation or arbitration under court-annexed programs of alternate dispute resolution or on the parties' own initiative." *General Accident Ins. Co. of Am. v. State, Dept. of Envtl. Protection,* 143 *N.J.* 462, 477, 672 *A.*2d 1154 (1996). The State of New Jersey Office of Dispute Settlement provides just such a useful mediation service. As we did in *Owens–Illinois, Inc. v. United Insurance Co.,* 138 *N.J.* 437, 478, 650 *A.*2d 974 (1994), we urge the involved business managers to study the cost effectiveness of stonewalling. Referring to the example of another case, we said: "The settlement was reasonable and the parties saved millions of dollars in litigation expense and thousands of hours of management time." *Ibid.*

■ On balance, then, considering the policies to be advanced by the application of each state's law, the interest of commerce among the states, and the interest of predictability and ease of administration all point toward application in a New Jersey forum of the laws of New York or of the specific waste sites concerning pollution exclusion. In the event of a conflict between the law of New York and the law of the waste site, the law of the waste site should be applied because under the site-specific approach it would have the dominant significant relationship to the issue. *See NL Industries, supra,* 65 *F.*3d at 321 (observing that *"Gilbert Spruance* thus establishes that, in environmental cases, the location of the site carries very substantial weight in the 'significant relationship' analysis, typically adequate to overcome the contacts of the place of contracting"); *Restatement, supra,* § 188, comment e (stating that when a contract deals with a "specific physical thing," such as a plant or waste site, "the location of the thing or of the risk is significant").

## B.

### What law governs the late-notice defense?

 Most liability-insurance contracts contain clauses that require policyholders to provide prompt notice of an occurrence that gives rise to coverage under the policy. Under traditional contract-law principles, breach of such a contractual condition would excuse the aggrieved parties' performance only if a party was actually prejudiced by the delay. New York, however, has adopted a limited exception to this general rule that exists for breach of notice provisions in insurance contracts. *See Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 *N.Y.*2d 576, 584 *N.Y.S.*2d 290, 594 *N.E.*2d 571, 573 (1992). In New York, absent a valid excuse, a failure to satisfy the notice requirement vitiates the policy and the insurer "need not show prejudice before it can assert the defense of non-compliance." *Id.*, 584 *N.Y.S.*2d 290, 594 *N.E.*2d at 571. In contrast, New Jersey and many other jurisdictions require a showing of prejudice before a contract of insurance may be avoided. The reason for the New York rule is to protect insurance companies so that they may make prompt investigation of claims. *Id.*, 584 *N.Y.S.*2d 290, 594 *N.E.*2d at 573. The reason for the New Jersey rule is to protect the interests of policyholders because insurance contracts are contracts of adhesion and policyholders should not lose the benefits of coverage unless the delay has prejudiced the insurance company. *Cooper v. Government Employees Ins. Co.*, 51 *N.J.* 86, 94, 237 *A.*2d 870 (1968). The laws are in conflict. We may safely assume that the laws of the waste sites will follow either of these two rationales. Applying the section 6 analysis, we find that the substantial weight given to the law of the waste site is not overcome. Because the purpose to be served by New Jersey's late-notice rule is the protection of New Jersey policyholders, we do not believe that the fact that Pfizer does business in New Jersey entitles it to the application of New Jersey law at the expense of the laws of the other competing states. To apply New Jersey law would unduly conflict with the interests of commerce among the states. Again, the interests of

predictability and fair expectations do not favor the choice of New Jersey law on the late-notice issue. *See supra* at 198–99, 712 A.2d at 640. Were the waste sites located in New Jersey, our interest in protecting the environment and compensating the victims of environmental pollution would be served and would overcome that concern.

Finally, application of New Jersey's late-notice rule would not materially advance judicial administration. We suspect that the notice issues at the several sites will frequently be different and we cannot see any genuine administrative benefit in the application of New Jersey law. Thus, the law of the waste site should govern if it differs from the law of New York.

## C.

To sum up, the governmental interests of a New Jersey forum under the *Morton/Spruance* analysis are protection of the regulatory process in New Jersey, protection of New Jersey policyholders, protection of the victims of pollution, and protection of the New Jersey environment. Those interests are minimally implicated when the issue concerns indemnity of a New York policyholder for environmental waste liabilities incurred in states other than New Jersey. That Pfizer has had a long-term significant business presence in New Jersey is important, *American Home Prods. Corp. v. Adriatic Ins. Co.*, 286 *N.J.Super.* 24, 40, 668 *A.2d* 67 (App.Div.1995), but must be viewed in perspective. Although Pfizer has had various business operations in New Jersey since 1900 (28% of the remediation costs are here, a large manufacturing facility is in Rutherford, and a product line headquarters is in Parsippany) and it now has approximately 2,200 employees engaged in various activities in New Jersey, those constitute five percent of Pfizer's total of over 40,000 employees. Pfizer has more employees—some 2,500—at its corporate headquarters in New York. Pfizer's 1993 sales of $375 million from New Jersey are five percent of Pfizer's total sales of $7.5 billion. Pfizer also has fourteen subsidiaries which have their home office in New York

and six subsidiaries which were incorporated in New York from at least 1961 to 1985. Pfizer's four principal plants and properties are outside New Jersey.

The interests of the parties and the interests of commerce favor the laws of either New York or the waste sites. As between the two, the law of the waste site would appear to have the more dominant significant relationship to the issues of interpretation of the pollution-exclusion clause and the late-notice defense. New Jersey's interests in judicial administration are important but, with the hindsight of our ruling in *Ciba–Geigy,* do not outweigh the interests of the other states.

We reverse the order of the Law Division and remand the matter for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—6.

*Opposed*—None.