178 F.3d 160
 ROBESON INDUSTRIES CORP., Appellant,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY; Zurich Insurance
Company; Continental Insurance Company.
In re: Robeson Industries Corp., Debtor,
Robeson Industries Corp.,
v.
Hartford Accident & Indemnity Company; Zurich Insurance
Company; Continental Insurance Company.
 Nos. 98-5168, 98-5285.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 17, 1999.
Decided May 13, 1999.
 
 Eugene R. Anderson (argued), Michael R. Magaril, Steven J. Pudell, Anderson Kill & Olick, P.C., Newark, NJ, for Appellants.
 Lon A. Berk (argued), Sandra Tvarian, Wiley Rein & Fielding, Washington, DC; Gerald A. Hughes, Hughes & Hendrix, West Trenton, NJ, for Appellee Zurich Insurance Company.
 James W. Greene (argued), Thompson, O'Donnell, Markham, Norton & Hannon, Washington, DC; Paul J. Russoniello, Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Zuckerman, Skinner & Kirchner, Cherry Hill, NJ, for Appellees Continental Casualty Company and American Casualty Company of Reading.
 BEFORE: GREENBERG, ROTH, and LOURIE,* Circuit Judges.
 OPINION OF THE COURT
 LOURIE, Circuit Judge.
 
 
 1
 Robeson Industries Corp. appeals from the decision of the United States District Court for the District of New Jersey affirming the bankruptcy court's grant of summary judgment that Robeson was not entitled to coverage under its insurance policies and could not prevail in its tort claims against the insurers. Robeson also appeals from the decision of the district court denying jurisdiction to review the bankruptcy court's imposition of sanctions under Bankruptcy Rule 9011. See Robeson Indus. Corp. v. Zurich Ins. Co., Civ. No. 97-5158(GEB) (D.N.J. Feb. 20, 1998) (summary judgment); (D.N.J. June 2, 1998) (sanctions). We affirm.
 
 BACKGROUND
 
 2
 This appeal arises out of an adversary proceeding commenced by debtor Robeson in the United States Bankruptcy Court for the District of New Jersey. In that proceeding, Robeson contended that Hartford Accident and Indemnity Co., Zurich Insurance Co., and Continental Insurance Co. (the "Insurers") had a duty to defend and indemnify it against claims arising from the discharge of certain contaminants at its manufacturing facility in Castile, New York, including a claim brought by the New York State Department of Environmental Conservation in 1990.[1] Robeson had purchased various commercial general liability insurance policies from the Insurers that provided coverage from 1976 to 1983. The policies were negotiated in New York and were issued to Robeson at its headquarters in Mineola, New York. Although the policies were apparently not identical as to the property covered, see Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33265(KCF), at 4 (Bankr.D.N.J. Jan. 24, 1997) (memorandum opinion), they all pertained generally to Robeson's New York property, including the Castile facility. None of the policies contained a choice-of-law provision.
 
 
 3
 The policies contained two provisions relevant to the present controversy. The first provision obligated Robeson to give prompt notice to the Insurers of any occurrence or third-party claim covered by the policies (the "late notice" provision).[2] The parties do not dispute that the states of New York and New Jersey differ in their interpretation of the "late notice" provision. Under New York law, an insured's breach of the timely notice provision relieves the insurer of its duty to defend or indemnify, even absent a showing of prejudice to the insured. See Unigard Sec. Ins. Co. v. North River Ins. Co., 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571, 573 (N.Y.1992). In contrast, under New Jersey law, an insurer must first establish prejudice before untimely notice relieves the insurer of its duties under the policy. See Cooper v. Government Employees Ins. Co., 51 N.J. 86, 237 A.2d 870, 874 (N.J.1968).
 
 
 4
 The second policy provision generally excludes coverage for environmental contamination, except for contamination that was "sudden and accidental" (the "pollution exclusion" exception). Although Robeson argued to the bankruptcy court that no conflict of law existed between New York and New Jersey on the interpretation of the "pollution exclusion" exception, the court disagreed, noting that New Jersey interprets the "sudden and accidental" language to cover gradual discharges, see Morton Int'l, Inc. v. General Accident Ins. Co., 134 N.J. 1, 629 A.2d 831, 870-75 (N.J.1993), whereas New York interprets this language as covering only abrupt discharges, see Powers Chemco, Inc. v. Federal Ins. Co., 74 N.Y.2d 910, 549 N.Y.S.2d 650, 548 N.E.2d 1301, 1302 (N.Y.1989). See also Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 712 A.2d 634, 640-41, 643-44 (N.J.1998) (summarizing the differences between New York's and New Jersey's interpretations of the "late notice" provision and the "pollution exclusion" exception).
 
 
 5
 The interpretations to be given to the "late notice" provision and the "pollution exclusion" exception are outcome-determinative in this case. Robeson did not timely notify the Insurers of their potential liability under the policies until December 1992, two-and-a-half years after the State of New York filed its claim against Robeson and several years after the contamination began. Moreover, Robeson's contamination was gradual, ostensibly occurring over several years. Robeson thus contended in the Bankruptcy court that New Jersey law applied to the interpretation of the policies. Robeson's main argument in support of its contention was that it had moved its headquarters to South Plainfield, New Jersey in April 1991.[3] Robeson further argued, in an attempt to show its close ties to New Jersey, that it had been using warehousing facilities in New Jersey for approximately the last twenty years, paid New Jersey taxes thereon, and had continually maintained management personnel and sales representatives in New Jersey.
 
 
 6
 The bankruptcy court, applying New Jersey choice-of-law rules, found Robeson's argument in favor of the application of New Jersey law unpersuasive, and held on summary judgment that New York law applied to the interpretation of the policy exclusions. See Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33265(KCF), at 17 (Bankr.D.N.J. Jan. 24, 1997). The court later granted summary judgment of non-coverage to the Insurers. See id. at 2-8 (Bankr. D.N.J. Aug. 27, 1997). The court also clarified that its choice-of-law ruling also applied to Robeson's tort claims against the Insurers--claims stemming largely from the Insurers' alleged bad faith with respect to the denial of coverage. Finding such claims to be unsustainable under New York law, the court granted summary judgment to the Insurers on the tort claims as well. See id. at 8-12. The district court summarily affirmed the bankruptcy court's summary judgment rulings on appeal. See Robeson Indus. Corp. v. Zurich Ins. Co., Civ. No. 97-5158(GEB) (D.N.J. Feb. 20, 1998).
 
 
 7
 In its summary judgment opinion, the bankruptcy court invited the Insurers to move for sanctions under Bankruptcy Rule 9011[4] because of Robeson's dogged insistence that New Jersey law or policy should apply even in the face of the court's earlier choice-of-law ruling and New York law directly on point. The Insurers accepted this invitation, and, not surprisingly, the bankruptcy court granted the resulting motion,[5] awarding the Insurers their litigation expenses for the time period between the court's choice-of-law ruling and its grant of summary judgment.
 
 
 8
 Robeson appealed the imposition of sanctions to the district court, but the court dismissed the appeal on the ground that it had not been filed within the ten-day time limit prescribed by Bankruptcy Rule 8002(a). The district court noted that the bankruptcy court signed its sanctions order on February 11, 1998, that the order was entered on the clerk's docket on February 23, 1998, and that the ten day period began to run on this latter date. Because Robeson's notice of appeal was filed on March 6, the district court continued, it was one day late and therefore the court lacked jurisdiction. See Robeson Indus. Corp. v. Zurich Ins. Co., Civ. No. 97-5158(GEB) (D.N.J. Jun. 1, 1998) (hearing transcript). Ruling in the alternative, the district court affirmed the decision of the bankruptcy court to impose sanctions on the merits. See id.
 
 
 9
 Robeson appealed the summary judgment rulings and the sanctions order to this court. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1994).
 
 DISCUSSION
 A. Standards of Review
 
 10
 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). This court reviews a district court's grant of summary judgment de novo, reapplying the summary judgment standard. See General Ceramics, Inc. v. Firemen's Fund Ins. Cos., 66 F.3d 647, 651 (3rd Cir.1995). Choice-of-law is a question of law which this court reviews de novo. See id. Whether an appeal from the bankruptcy court to the district court is timely is also a question of law which this court reviews de novo. See Shareholders v. Sound Radio, Inc., 109 F.3d 873, 879 (3rd. Cir.1997). Because we sit in diversity in the present case, we are bound to follow the substantive law of the forum, see Clark v. Modern Group, Ltd., 9 F.3d 321, 326 (3rd Cir.1993), including the forum's choice-of-law rules, see Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
 
 B. Choice-of-Law
 
 11
 The Supreme Court of New Jersey has in several cases set forth New Jersey's choice-of-law rules for the interpretation of casualty insurance contracts. See, e.g., Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 712 A.2d 634 (N.J.1998); HM Holdings, Inc. v. Aetna Cas. & Sur. Co., 154 N.J. 208, 712 A.2d 645 (N.J.1998) (decided concurrently with Pfizer ); Unisys Corp. v. Insurance Co. of N. Am., 154 N.J. 217, 712 A.2d 649 (N.J.1998) (decided concurrently with Pfizer ); Gilbert Spruance Co. v. Pennsylvania Mfrs.' Ass'n Ins. Co., 134 N.J. 96, 629 A.2d 885 (N.J.1993). See also General Ceramics, supra. These cases make clear that New Jersey follows § 193 of the Restatement (Second) of Conflict of Laws.[6] Pfizer, "applying the principles" laid down in the Court's earlier opinion in Spruance, sets forth the operative portions of that provision:
 
 
 12
 Spruance set forth a specific choice-of-law framework for interpreting casualty-insurance contracts. Under this framework, a court looks first to Restatement section 193, which provides that the place that "the parties understood ... to be the principal location of the insured risk governs unless some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties."
 
 
 13
 Pfizer, 712 A.2d at 638 (citation deleted). Thus, under § 193 of the Restatement, New Jersey generally interprets casualty-insurance policies in accordance with the law of the state in which the insured risk is principally located, unless some other state has a more significant relationship to the transaction and the parties as illuminated by the consideration of factors listed in § 6.[7] The Court has referred to the approach under § 193 as "site-specific." See Pfizer, 712 A.2d at 637.
 
 
 14
 However, not every application of § 193 necessitates review of the § 6 factors. Indeed, rote application of the § 6 factors would swallow the "site-specific" rule that § 193 prescribes. The Supreme Court of New Jersey has recognized as much:
 
 
 15
 When the policy covers risks located primarily in a single state, the choice-of-law issue can be straightforward. For example, there is no choice-of-law issue where the policyholder is located in one state, the environmental liability arises out of the same state, and the policies are issued by a state-based insurer for that one site. An easy example is that of a [commercial general liability] policy covering a solid waste treatment plant creating a risk in a single state. At the other end of the spectrum are cases where a single insured seeks coverage under [commercial general liability] policies for certain environmental and toxic tort liabilities, including ... [multiple] sites located in ... different states. When such an insured operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes; in such a case, section 193 directs that the governing law is that of the state with the dominant significant relationship according to the principles set forth in Restatement section 6 as applied to the particular issue involved.
 
 
 16
 Pfizer, 712 A.2d at 638 (citations and quotations omitted). Therefore, a court need only consider the application of the § 6 factors when the "insured operation or activity is predictably multistate," that is, when the policy covers sites in many states, or when the insured risk is transient. See id. at 639 (noting that the insured risk was "to some degree transient," and therefore "to choose the applicable law that governs the disputed issues, Spruance requires that we turn to the § 6 analysis."). The comments to § 193 confirm this interpretation:
 
 
 17
 The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where the location of the risk has less significance, include (1) where the insured object will be more or less constantly on the move from state to state during the terms of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states.
 
 
 18
 Restatement (Second) of Conflict of Laws § 193 cmt. b (1969).
 
 
 19
 Robeson's principal argument is that HM Holdings, a case decided concurrently with Pfizer, mandates that New Jersey law applies in this case, at least with respect to the interpretation of the "late notice" provision. Robeson asserts that that case is "remarkably similar" to the facts presented here. We disagree. Like Pfizer, Unisys, Spruance, and General Ceramics, HM Holdings involved a "predictably multistate" insured operation, which consequently necessitated a § 6 inquiry on its particular facts. Specifically, HM Holdings involved coverage under a commercial general liability policy of nine waste sites located within seven different states. See HM Holdings, 712 A.2d at 646-47. The Court concluded under § 6 that the law of the waste sites would apply to the interpretation of the "pollution exclusion" exception, and that either the law of New Jersey or the law of the waste sites applied to the "late notice" provision, with New Jersey law taking precedence if the law of the waste sites was similar to New York's, the state in which the parties were headquartered. See id. at 648-49.
 
 
 20
 In contrast, Robeson's insured activities were not "predictably multistate," and they thus fit within the general site-specific rule of § 193. The policies involved covered only Robeson's New York property, and only New York was implicated by Robeson's contamination. Compare Spruance, 629 A.2d at 885 (involving the hauling of waste from Pennsylvania to New Jersey). These facts alone are dispositive under § 193 because the parties at the time of contracting clearly understood New York (more specifically, Robeson's plant in Castile) to be the principal location of the insured risk. In fact, the facts of this case, viz., "a commercial general liability policy covering a ... plant creating a risk in a single state," were described by the Supreme Court of New Jersey as an "easy example" that presents "no choice-of-law issue" and no need for a complex balancing of factors under § 6. See Pfizer, 712 A.2d at 638; cf. Spruance, 629 A.2d at 891 ("When the waste producing facility and the waste site are located in the same state, their common location makes the application of section 193 straightforward.").[8]
 
 
 21
 Robeson's argument concerning the movement of its headquarters to New Jersey does not alter the result to which § 193 directs us. First, the site-specific rule prescribed by that section is unaffected by the location of the contracting parties' headquarters; the focus is the parties' understanding of the location of the insured risk.[9] Second, § 193 prescribes that it is the parties' understanding of the principal location of the insured risk "during the term of the policy" that matters. Thus, the movement of Robeson's headquarters to New Jersey seven years after the expiration of the last of the policies at issue cannot have affected the parties' understanding at the time of contracting that New York was the principal location of the insured risk. Robeson's other contacts with New Jersey likewise do not affect the analysis under § 193.
 
 
 22
 We conclude that the district court correctly affirmed the bankruptcy court's application of New Jersey choice-of-law rules and correctly affirmed the application of New York law to the interpretation of the policies. Because Robeson does not dispute that it is not entitled to coverage under the laws of New York, the district court's affirmance of the bankruptcy court's grant of summary judgment to the Insurers is also affirmed.
 
 C. The Tort Claims
 
 23
 Robeson argues that the bankruptcy court improperly applied New York law to its tort claims. Robeson asserts that its tort claims are independent of its claim for coverage under the policy, and that New Jersey choice-of-law rules mandate that New Jersey law should apply to those claims. Robeson supports this assertion by noting that its various tort claims,[10] which it summarizes generally as the Insurers' "bad-faith claims handling and investigation of Robeson's claims in connection with the Castile facility," Robeson's Opening Brief at 18, all took place after Robeson had moved its headquarters to New Jersey and therefore that the state of New York has no relevant interest in the controversy. Robeson argues further that New Jersey law allows for the imposition of tort liability against an insurer for bad faith even when the insured was not entitled to coverage under the policy, and cites several cases from various state supreme courts in support of this contention. The Insurers respond that the same state's law--New York's--should apply to both Robeson's coverage and bad faith claims because the bad faith claims merely arise out of alleged unsatisfactory performance by the Insurers under the policy. Accordingly, the Insurers contend that New York law applies to the propriety of the bad faith claims, and that such claims are unsustainable thereunder.
 
 
 24
 We do not necessarily agree with the bankruptcy court's conclusion that the same state's law necessarily applies to the coverage and bad faith claims. The appellate courts of New Jersey have explained that
 
 
 25
 conflict of laws principles do not require that all legal issues presented by a single case be decided under the law of a single state. Instead the choice of law decisions can and should be made on an issue-by-issue basis, and thus the law of different states can apply to different issues in the same case.
 
 
 26
 O'Connor v. Busch Gardens, 255 N.J.Super. 545, 605 A.2d 773, 774 (N.J.Super.Ct.App.Div.1992) (citing Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J.Super. 51, 593 A.2d 367, 375 (N.J.Super.Ct.App.Div.1991)). Therefore, a separate analysis to determine which state's law applies to Robeson's bad faith claim would normally be appropriate.
 
 
 27
 However, application of New Jersey's conflict-of-law rules is unnecessary here because neither New Jersey nor New York would sustain Robeson's tort claims. In New York University v. Continental Insurance Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y.1995), the Court of Appeals of New York dismissed a claim analogous to Robeson's, namely, that the insurer had negligently and recklessly failed to adequately investigate the insured's claim and denied payment. See New York Univ., 639 N.Y.S.2d 283, 662 N.E.2d at 769-70. The Court of Appeals began its analysis by noting that insurance policies, like other contracts, contain an implied duty of good faith and fair dealing. See id. at 769. In order to sustain an action for tort liability against an insurer, as opposed to an action for breach of contract, the insured's complaint must assert a basis for tort liability that goes beyond the breach of the insurer's contractual duties. See id. at 770 (noting that the insured's complaint must state a "tort independent of the contract"). The Court of Appeals concluded that
 
 
 28
 Plaintiff's claim amounts to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing, and the use of familiar tort language does not change the cause of action to a tort claim in the absence of an underlying tort duty sufficient to support a claim for punitive damages.
 
 
 29
 The cause of action is duplicative of the ... cause of action for breach of contract and should have been dismissed.
 
 
 30
 Id. (citations omitted). Because Robeson's tort claims in essence allege no more than that the Insurers engaged in bad faith in their performance of their duties under the policy, New York law mandates their dismissal.
 
 
 31
 Robeson's bad faith claim does not fare any better under New Jersey law. In Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (N.J.1993), the New Jersey Supreme Court concluded that "there is a sufficient basis in law to find that an insurance company owes a duty of good faith to its insured in processing a first-party[11] claim," a conclusion which rested largely on the understanding that contracts generally contain an implied duty of good faith and fair dealing. See Pickett, 621 A.2d at 450. After extensive analysis of the authorities, the Court concluded that the cause of action for bad faith is "best understood as one that sounds in contract," id. at 452, and that contract damages were the appropriate remedy for breach, see id. at 454. The Court continued that whether bad faith exists depends on whether the insured's claim was "fairly debatable." Id. at 453. In other words, the insured must "show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Id. In defining the scope of what claims are "fairly debatable," the Court noted the following:
 
 
 32
 Perhaps the [fairly debatable] rule is easiest to understand in the context of the denial of benefits on the basis of non-coverage.... Under the "fairly debatable" standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim.
 
 
 33
 Id. at 453-54 (citations omitted).
 
 
 34
 Here, Robeson did not establish a right to summary judgment that there was coverage. In fact, summary judgment was decided in favor of the Insurers, a ruling which we have affirmed as correct. Accordingly, the Insurers did not act in "bad faith" as a matter of New Jersey law.
 
 
 35
 Because the application of the laws of New York or New Jersey to Robeson's tort claims would lead to the same conclusion--i.e., dismissal--there is no need for us to embark upon a choice-of-law analysis with respect thereto. Instead, we agree with the bankruptcy court and the district court that these claims were not sustainable in either jurisdiction, and we affirm the grant of summary judgment in favor of the Insurers.
 
 D. Sanctions
 
 36
 Robeson's final argument is that its appeal of the bankruptcy court's sanctions order to the district court was not untimely under Bankruptcy Rule 8002(a). In support of its argument, Robeson contends that the ten-day time period of Rule 8002(a) did not begin to run until the district court had finally disposed of Robeson's earlier appeal on the merits of coverage and tort liability on February 24, 1998.[12] As Robeson's appeal of the sanctions order was filed on March 6, 1998, within 10 days of February 24th, Robeson contends that its appeal was timely filed.
 
 
 37
 We disagree. Rule 8002(a) states that "[t]he notice of appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from." This court has noted that "[t]his deadline is strictly construed. The failure to file a timely notice of appeal creates a jurisdictional defect barring appellate review." Shareholders v. Sound Radio, Inc., 109 F.3d 873, 879 (3rd Cir.1997) (citations omitted). The rule clearly defines the act that starts the running of the appeal period--viz., entry of the order in the bankruptcy court. The rule makes no exception for the circumstance that a party has taken an appeal to the district court on the merits of the case or on a separate issue presented in the same controversy. Furthermore, we perceive no reason that such an exception is warranted, and in any event it would not be consistent with the "strict construction" that we are required to afford to the rule. Accordingly, we agree with the district court that Robeson's appeal of the sanctions order was not timely and that the district court therefore lacked jurisdiction to review that order. Given our affirmance on jurisdictional grounds, we express no opinion on the district court's conclusion that the sanctions order was otherwise affirmable on its merits.
 
 CONCLUSION
 
 38
 The district court did not err in (1) affirming the bankruptcy court's conclusion that New York law applied to the interpretation of the insurance policies at issue and that Robeson was not entitled to coverage thereunder, (2) affirming the bankruptcy court's conclusion that Robeson's tort claims were unsustainable, or (3) dismissing Robeson's appeal on the issue of sanctions for lack of jurisdiction. Accordingly, the judgment of the district court is
 
 
 39
 AFFIRMED.
 
 
 
 *
 Honorable Alan D. Lourie, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 In addition, a private claim was later filed after the commencement of the bankruptcy proceeding by an adjacent landowner. See Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33265(KCF), at 3 (Bankr.D.N.J. Jan. 24, 1997) (memorandum opinion)
 
 
 [2]
 What we refer to as the "late notice" provision is actually two separate provisions in the policies that cover different circumstances, both of which were implicated in this case. The first provision states: "If a claim is made or suit is brought against insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." See Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33265(KCF), at 3 (Bankr.D.N.J. Aug. 27, 1997) (memorandum opinion) (emphasis added). The second provision states: "In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of available witnesses, shall be given by or for the insured to the company, or any of its authorized agents as soon as practicable." Id. (emphasis added)
 
 
 [3]
 At some time prior to its filing of the instant suit, Robeson moved its headquarters again from New Jersey to California. See Robeson's Brief, at 8 n. 9
 
 
 [4]
 Bankruptcy Rule 9011 is similar to Rule 11 of the Federal Rules of Civil Procedure. It states in relevant part:
 (b) Representations to the court--By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances--(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]
 Subsection (c) provides for the imposition of sanctions for the breach of a party's Rule 9011 obligations.
 
 
 [5]
 The bankruptcy court stated: "This court determined on January 27, 1997 that under New Jersey choice of law rules ... New York law applied. From January 27, 1997 to August 27, 1997, the plaintiff in an overly zealous manner created expense to the defendants on related issues without presenting [a] consistent theory or a good faith argument for reversing existing [law]. [Robeson's] briefs were duplicative, circulative, voluminous, self-righteous and full of[citations to] selfserving publication[s] which it authored." See Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33256(KCF), at 2 (Bankr.D.N.J. Feb. 11, 1998) (memorandum opinion)
 
 
 [6]
 The validity of a contract of fire, surety or casualty insurance and
 the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
 Restatement (Second) of Conflicts of Law § 193 (1969).
 
 
 [7]
 [T]he factors relevant to the choice of the applicable rule of law
 include (a) the needs of the interstate and international system, (b) the relevant policies of the forum, (c) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.
 Restatement (Second) of Conflict of Laws § 6 (1969).
 The Supreme Court of New Jersey, following Ceramics, collapsed these factors into four "categories" for purposes of application: (1) the competing interests of the relevant states, (2) the national interests of commerce among several states, (3) the interests of the parties in realizing justified expectations and achieving predictable results, and (4) the interests of judicial administration. See Pfizer, 712 A.2d at 639-40.
 
 
 [8]
 The bankruptcy court was also aware that "[t]he instant case represents the hypothetical 'straightforward' case suggested by the court in [Spruance ] because the insured risk was not transient and was not scattered through several states." See Robeson Indus. Corp. v. Zurich Ins. Co., Bankr.No. 93-33265(KCF), at 10 (Bankr.D.N.J. Jan. 24, 1997) (memorandum opinion). Despite the bankruptcy court's recognition of this fact, and its proper conclusion based thereon that New York law should apply to the interpretation of the policies, the court went on to balance the various states' interests under § 6. While we consider this extra step unnecessary under § 193, we believe that it helped to underscore the bankruptcy court's conclusion
 
 
 [9]
 We do not mean to suggest that the location of a party's headquarters is irrelevant in a "multistate activity" case--i.e., when a weighing of the § 6 factors is warranted under § 193, see, e.g., Pfizer, 712 A.2d at 641 (assessing the relevance of New York law in a multistate site case because New York was the principal place of business of the insured and was the location in which the contracts were negotiated), but this is not such a case
 
 
 [10]
 The relevant tort claims are styled in Robeson's complaint as "breach of covenant of good faith and fair dealing," "failure to warn," and "breach of fiduciary duty." See Robeson's Complaint at 15, 17, 22. Review of these claims reveals, as Robeson admits, that the claims are premised upon the Insurers' alleged bad faith in the handling of Robeson's claims. Thus, we will refer to Robeson's various tort claims as a single claim for bad faith
 
 
 [11]
 Both New York University and Pickett involve first-party claims. However, we see no reason why the rationales of these cases should not likewise apply in the third-party context, i.e., when the policy covers damage to a third party's property
 
 
 [12]
 Appellee Zurich appears to have misunderstood Robeson's argument, for it discusses the relevance of the fact that the district court had stayed its sanctions order pending resolution of Robeson's earlier appeal on the merits of coverage and tort liability. However, Robeson clearly articulates its argument in its opening brief: "The relevant issue before this Court is whether an appeal of sanction may proceed in the absence of a final adjudication of an action, not whether a court's entry of a stay of its own sanctions order tolls the time to file a notice of appeal from the Order." Robeson's Opening Brief, at 43 (emphasis in original). Given the clarity of Robeson's argument, there is no reason for us to consider the relevance of the district court's stay