

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-2007

# Siemens Bldg Tech v. PNC Fin Ser Grp Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3646

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Siemens Bldg Tech v. PNC Fin Ser Grp Inc" (2007). *2007 Decisions*. Paper 1370.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1370

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.  05-3646

SIEMENS BUILDING TECHNOLOGIES, INC.
formerly known as CERBERUS PYROTRONICS,
Appellant

v.

PNC FINANCIAL SERVICES GROUP INC.,
doing business as PNC BANK;
MICHELLE WILLIAMS;
JOHN DOES 1 through 10;
ELOISE TANNER

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No.  02-cv-00868)
District Judge:  Honorable Katharine S.  Hayden

Argued  November 28, 2006

Before:  RENDELL and AMBRO, <u>Circuit</u> <u>Judges</u>
and PRATTER*, <u>District</u> <u>Judge</u>.

(Filed: April 3, 2007)

* Honorable Gene E. K. Pratter, District Court Judge for the Eastern District of
Pennsylvania, sitting by designation.

Patrick D.  Sheridan

Robert R. Niccolini    **[ARGUED]**
McGuire Woods
Seven Saint Paul Street
Suite 1000
Baltimore, MD  21202

Scott A.  Lazar
Barrett, Lazar & Lincoln
145 West Passaic Street
2nd Floor
Maywood, NJ  07607
    *Counsel for Appellant*

Gregg S.  Sodini    **[ARGUED]**
Sodini & Spina
510 Thornall Street
Suite 180
Edison, NJ  08838
    *Counsel for Appellee*
    *PNC Financial Services Group Inc.*

---

OPINION OF THE COURT

---

RENDELL, <u>Circuit Judge</u>.

Siemens Building Technologies, Inc. ("Siemens") appeals from the June 24, 2005, Order of the District Court granting a motion by PNC Bank ("PNC") for summary judgment on Siemens's *respondeat superior* claim and denying Siemens's cross-motion for summary judgment on the theory of apparent authority.  We will affirm the Order of the District Court.[1]

---

[1]We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

2

I.

From January of 1996 through March of 1998, Michelle Williams was employed as an assistant in the payroll department of Cerberus Pyrotronics, Inc. in Cedar Hill, New Jersey.[2] During the course of her employment, Williams defrauded Siemens through a check-cashing scheme in which she made out payroll checks to other employees, forged the endorsement signatures of those employees and then cashed the checks for her own gain at PNC Bank. In total, Williams cashed 639 fraudulent checks totaling over $300,000.

In February of 1998, when several Siemens employees complained that their 1997 W2 forms reflected earnings greater than what they had actually received, Williams's superiors in the payroll department uncovered indications of her wrongdoing and, on March 6, 1998, confronted Williams with their suspicions. Williams admitted that she had defrauded Siemens and was terminated. Siemens subsequently hired the accounting firm KPMG to investigate the extent of Williams's fraud. In its May 1999 final report on the matter, KPMG notified Siemens of its discovery that Williams had cashed all of the fraudulent checks at one of two local branches of PNC Bank and that the same teller had handled all 639 of the transactions.[3]

_____

[2]Cerberus was purchased by Siemens following the events giving rise to this litigation. As the parties have done in brief, we will refer to Williams's employer as Siemens throughout this Memorandum.

[3]Siemens did not maintain its payroll account with PNC and, otherwise, was not a customer of PNC. Therefore, Williams would cash the check at PNC and PNC would in

After Siemens notified PNC of the results of the KPMG investigation, the Bank

identified Eloise Tanner as the teller who had cashed all of Williams's checks. Tanner

held the position of "Head Teller" at PNC and, as such, had the discretion to cash non-

customer checks when she had reason to believe they were backed by sufficient funds.

When PNC confronted Tanner in January of 2000, she claimed that she did not know

Williams and that she had cashed the checks because she believed that PNC had an

agreement with Siemens to do so. PNC was unable to locate, and was otherwise unaware

of, any such agreement. PNC subsequently dismissed Tanner, though PNC claims that

Tanner's dismissal was prompted by the discovery of a $5,000 shortfall in Tanner's

"reserve vault," rather than any role she may have played in Williams's scheme.[4]

In February of 2003, Siemens brought an action against PNC Bank, Williams,

Tanner and nine "John Doe" employees of PNC Bank with supervisory powers over

Tanner, alleging fraud, negligence, violations of federal and state racketeering statutes

and seeking recovery of Siemens's lost $300,000. Although Siemens's complaint alleged

eight counts, Counts I, II, V, VI, VII and VIII were disposed of early in the litigation and

are not before us. Nor is Count IV, which Siemens voluntarily dismissed.

The District Court's order from which Siemens appeals deals only with Count III:

Siemens's claim that "PNC is vicariously liable to Siemens for the deliberate fraud of its

turn seek reimbursement from Siemens's account-holder bank.

[4]Despite Tanner's claims that she did not know Williams, Tanner's original
employment application for her position listed Williams as a reference.

agent, Tanner, under the doctrine of *respondeat superior*." PNC moved for summary judgment on this claim, arguing that PNC could not be vicariously liable for fraud because Tanner's actions were taken outside the scope of her employment. Siemens brought a cross-motion, arguing that "PNC is vicariously liable for Tanner's wrongful conduct because PNC placed her in the position of head teller which enabled her, cloaked with apparent authority to cash non-customer checks, to commit a fraud upon Siemens."

The District Court granted PNC's motion, reasoning that, though "[b]ank tellers commonly cash and process checks for customers of a bank; knowingly cashing fraudulent checks is not the same thing" and, therefore, that "Tanner's acts [were] outside the scope of her employment and the doctrine of respondeat superior, as applied by New Jersey courts, is inapplicable." It also determined that "no reasonable jury could conclude that Tanner was motivated, in whole or in part, to serve PNC's interests." Finally, the District Court also denied Siemens's cross-motion, holding that because "apparent authority protects only the innocent third party and not all interested parties, PNC is not liable to Siemens for Tanner's fraudulent conduct under apparent authority."

Siemens now appeals these rulings of the District Court. We review the District Court's grant of summary judgment *de novo*. *Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 164 (3d Cir. 1999). Because we sit in diversity, we will apply the substantive law of New Jersey, the forum state in this matter. *Id*. at 165.

## II. – *Respondeat Superior*

Siemens argues that PNC should be held vicariously liable for Tanner's fraudulent

conduct under the doctrine of *respondeat superior*.

Under New Jersey law, "an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003). To succeed in bringing a *respondeat superior* claim, "a plaintiff must prove (1) that a master-servant relationship existed and (2) that the tortious act of the servant occurred within the scope of that employment." *Id.*

In this case, neither side disputes that a master-servant relationship existed between PNC and Tanner. The question here is whether Siemens has offered enough evidence such that a reasonable jury could conclude that Tanner's acts were within the scope of her employment. "The question whether or not the act done is so different from the act authorized is decided by the court if the answer is indicated; otherwise, it is decided by the jury." *Mason v. Sportsman's Pub*, 702 A.2d 1301, 1310 (N.J. Super. Ct. App. Div. 1997).

Generally, the phrase "scope of employment" "refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Carter*, 815 A.2d at 465 (citations omitted). More specifically, "scope of employment is subject to analysis under Restatement [(Second) of Agency] sections 228 and 229," both of which the New Jersey

6

Supreme Court has explicitly adopted as the guiding principles of this inquiry.[5]  *Id.*

Restatement (Second) § 228 reads:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>> (a) it is the kind he is employed to perform;
>> (b) it occurs substantially within the authorized time and space limits;
>> (c) it is actuated, at least in part, by a purpose to serve the master; and
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorize, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Additionally, Restatement (Second) § 229 reads:

> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

---

[5]The New Jersey Supreme Court has not yet adopted the formulation of *respondeat superior* given in the Restatement (Third) of Agency, which was published earlier this year.  *See* RESTATEMENT (THIRD) OF AGENCY § 7.07.  For our purposes, the key difference between the Second and Third Restatement is the degree to which the employee must intend his or her actions to be in service of his or her employer before vicarious liability can attach.  In the Second Restatement, as noted below, the conduct is not within the scope of employment if it is "too little actuated by a purpose to serve the master."  RESTATEMENT (SECOND) OF AGENCY § 228(2) (1958).  However, in the Third Restatement, conduct is not within the scope of employment "when it occurs within an independent course of conduct not intended by the employee to serve *any purpose of the employer*."  RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (1958) (emphasis added).  As stated, we will follow the approach set forth in the Second Restatement.

(a) whether or not the act is one commonly done by such servants;
(b) the time, place and purpose of the act;
(c) the previous relations between master and the servant;
(d) the extent to which the business of the master is apportioned between different servants;
(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
(f) whether or not the master has reason to expect that such an act will be done;
(g) the similarity in quality of the act done to the act authorized;
(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
(i) the extent to which the departure from the normal method of accomplishing an authorized result; and
(j) whether or not the act is seriously criminal.

Finally, "whether the conduct is intentional or negligent is generally irrelevant." *Cosgrove v. Lawrence*, 520 A.2d 844, 847 (N.J. Super Ct. Law Div. 1986).  Nor is it determinative that the employee's tortious conduct violated a specific employer policy. *Wright v. Globe Porcelain Co.*, 179 A.2d 11, 14 (N.J. Super. Ct. App. Div. 1962).

Although the Restatement sections set forth numerous factors for us to consider, we believe the core issue before us to be Tanner's intent.  The District Court determined that "no reasonable jury could conclude that Tanner was motivated, in whole or in part, to serve PNC's interests."[6]  In approaching this issue, we are mindful that, as Siemens

_____

[6]The District Court also focused on whether Tanner was acting within the scope of her employment and concluded she was not because the act she took, "knowingly cashing fraudulent checks," was "sufficiently different from the act authorized."  We disagree with this approach.  Under Restatement (Second) § 229(1), we are to determine whether

8

conceded at oral argument, it was Siemens's burden to show that Tanner was motivated "at least in part, by a purpose to serve" PNC. *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003) (holding that "a plaintiff must prove" both the existence of a master-servant relationship and that the employee's actions were in the scope of employment). Siemens has failed to meet this burden. Siemens did not depose Tanner and, therefore, has not offered any direct statement from her regarding her intentions. Although Siemens has offered evidence indicating that PNC tellers were encouraged to cash non-customer checks in order to build relationships and promote the bank's image, Siemens has not offered anything to indicate that Tanner was motivated by this policy. Siemens may not satisfy its burden in this case by relying solely on evidence of some hypothetical benefit to PNC generally – it must offer evidence of Tanner's motivations specifically in this situation. Siemens has simply offered no such evidence.

Siemens argues that we should only examine whether the "act itself" – here, cashing checks – comes within the scope of Tanner's employment and that we should disregard the "intent to serve" aspect of the analysis. In making this argument, Siemens relies heavily on *Abbamont v. Piscataway Twp. Bd. of Ed.*, 650 A.2d 958 (N.J. 1994), and *Hill v. New Jersey Dep't of Corr. Comm'r*, 776 A.2d 828 (N.J. Super. Ct. App. Div.

---

the act at issue is "of the same *general nature* as that authorized." (emphasis added). The plain language of this provision suggests that we should resist defining conduct with reference to the particular facts attendant to that conduct or with reference to any other limiting parameters. Instead, the Restatement makes clear that we should define the relevant act in broad terms. Here, it is more properly said that Williams "cashed checks," and that this was the conduct authorized by PNC in her role as a teller.

9

2001). We will forgo a lengthy discussion of *Abbamont* and *Hill* here, except to say that, though both cases set forth and describe the *respondeat superior* framework, neither case discusses, much less repudiates, the "intent to serve" aspect of the doctrine. Therefore, we are not persuaded that these cases reflect any change in New Jersey law regarding *respondeat superior*.

We have little difficulty in affirming the District Court's judgment that Siemens has failed to offer enough evidence to suggest that Tanner was acting within the scope of her employment in cashing the checks at issue.

### III. – Apparent Authority

Siemens also argues that PNC is liable for Tanner's fraud under a theory of apparent authority.[7] In fact, PNC's "apparent authority" argument is an amalgamation of two separate arguments sounding in different sections of the Restatement. We find neither to be persuasive.

Siemens's first apparent authority argument evokes the doctrine's traditional notion, which dictates that liability "will be imposed upon the principal in cases . . . where the actions of a principal have misled a third party into believing that a relationship of authority existed." *Lobiondo v. O'Callaghan*, 815 A.2d 1013, 1018 (N.J. Super. Ct. App.

---

[7]We note that Siemens did not plead this theory in its complaint, instead raising it for the first time in its brief in support of its cross-motion for summary judgment. The District Court identified this defect but ultimately decided to rule against Siemens on the merits. Although PNC argues that the issue is not properly before us and that we should decline to entertain it, we will follow the lead of the District Court and opine on the merits of Siemens's argument.

10

Div. 2003) (quoting *Rodriguez v. Hudson County Collision Co.*, 686 A.2d 776, 780 (N.J.

Super. Ct. App. Div. 1997). However, it is clear that apparent authority "exists only to

the extent that it is reasonable for the third person dealing with the agent to believe that

the agent is authorized. Further, the third person must believe the agent to be authorized."

RESTATEMENT (SECOND) OF AGENCY, § 8 cmt. c (1958). Siemens neither articulates

clearly how it was "misled" nor identifies the particular act it believed Tanner was

authorized to take. Indeed, Siemens fails to deal with the fact that it was Siemens's own

employee who, rather than being "misled," initiated and perpetrated the fraud.[8]

Siemens's other "apparent authority" argument relies on § 219(2)(d) of the

Restatement (Second) of Agency. Siemens argues that PNC should be held liable for

Tanner's fraud because Tanner "was aided in accomplishing the tort by the existence of

the agency relationship." Siemens cites *Gaines v. Bellino*, 801 A.2d 322 (N.J. 2002), as

supporting the application of this principle to intentionally tortious activity such as

---

[8]Related to this argument is Siemens's reliance on Restatement (Second) § 261, which states that a "principal who puts a servant or other agent in a position which enables the agent, while apparently acting within its authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud." However, the Restatement clearly states that liability under § 261 is premised upon "the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." RESTATEMENT (SECOND) OF AGENCY § 261 cmt. a (1958). Siemens's argument is, apparently, that Williams was the "third party" from whose point of view "the transaction seem[ed] regular on its face." Again, however, it was Williams who created and implemented the scheme and, therefore, it defies all reason to suggest that Williams could have in someway been deceived by Tanner's actions.

11

Tanner's. However, *Gaines*, like similar cases such as *Abbamont*, *Hill* and *Lehmann v. Toys 'R' Us*, 626 A.2d 445 (N.J. Super. Ct. App. Div. 1993), deals with actions brought under very specific statutory schemes designed to govern sexual harassment and other employment-related claims. While not entirely clear, the New Jersey Supreme Court's application of § 219(2)(d) in these cases appears to be a discrete effort to realize and effectuate the policies giving rise to those statutory schemes rather than an endorsement of applying § 219(2)(d) to all *respondeat superior* situations. Indeed, applying § 219(2)(d) to this case would, in effect, strip certain prongs from the "scope of employment" aspect of the *respondeat superior* test. None of the cases cited by Siemens reflect the New Jersey Supreme Court's intention to depart so significantly from these well-established principles. We decline to predict that the New Jersey Supreme Court would engage in such a massive shift in the New Jersey law of agency.

For the reasons set forth above, we will affirm the Order of the District Court.

AMBRO, <u>Circuit Judge</u>, concurring.


No part of the Court's substantive analysis of the *respondeat superior* and

Restatement of Agency issues gives pause. I write separately only because I believe that

this case presents substantial questions relating to the interplay of the Uniform

Commercial Code with these issues. Indeed, the chain of consideration begins with the

UCC, for in many cases it may preempt common-law claims. I ultimately conclude that

the UCC does not preempt Siemens's cause of action, and so I join the Court's opinion.

In this context, the UCC's reach in this area is shorter than it should be, and so I urge its

drafters to consider extending the comparative negligence rule of U.C.C. § 3-404(d)[9] to

this situation.

## I.

"Unless displaced by the particular provisions of [the UCC], the principles of law

and equity . . . supplement its provisions." U.C.C. § 1-103. This text leaves the

impression that the UCC's preemptive effects are limited and narrow. Not so. As the

Official Comments explain, the UCC's preemptive reach is actually quite long:

> [T]he Uniform Commercial Code is the primary source of commercial law
>
> rules in areas that it governs, and its rules represent choices made by its
>
> drafters and the enacting legislatures about the appropriate policies to be

---

[9] Unless otherwise noted, all references to Article 3 of the U.C.C. are to the 1990 version.

furthered in the transactions it covers.  Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, *or the purposes and policies those provisions reflect*, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions *or its purposes and policies*.

U.C.C. § 1-103 cmt. 2 (third and fourth alterations added).[10]  Hence, we apply the common law to commercial cases only when (1) the UCC explicitly so provides or (2) the common law supplements the text, purposes, or policies of the UCC without supplanting them.

Article 3 of the UCC regulates negotiable instruments, including checks. Specifically, it apportions liability among drawers, drawees, indorsers, and collecting banks when the check collection process goes awry.  U.C.C. § 3-401 to 20.  In particular,

_____

[10] I recognize that the 2001 revisions to Article 1 of the Uniform Commercial Code quoted here have not been officially adopted by the New Jersey Legislature.  However, the drafters of the UCC note that "except for changing the form of reference to the [UCC] and minor stylistic changes," revised § 1-103 simply combines former sections 1-102 and 1-103 to "reflect the interrelationship" between the two sections.  UCC § 1-103 cmts. Thus, my reliance on revised § 1-103 is in line, as it is not substantively different from former §§ 1-102 & 103.

it provides that when a drawer corporation (here, Siemens) has a faithless employee (Williams) who enriches herself by causing the corporation to issue fraudulent checks, the default rule is that liability falls on the drawer, not the bank, because the UCC renders the faithless employee's fraudulent indorsement "effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection." U.C.C. § 3-404(b)(2).

This age-old scheme can take many forms. Here, Williams defrauded Siemens by causing it to issue checks payable to employees (current and former), fraudulently indorsing the checks, and cashing them.[11] Section 3-404 by its terms comes into play: it applies when "a person whose intent determines to whom an instrument is payable does not intend the person identified as payee to have any interest in the instrument." U.C.C. § 3-404 (internal cross references omitted). While the wording no doubt is obtuse, both elements of the section are met here: Williams determined to whom payroll checks were payable,[12] and she did not intend for the named payees to have any interest in them.

The problem here is that Williams was not alone. Tanner, a head teller at a PNC

---

[11] This scheme took three forms: Williams caused Siemens to issue (1) two payroll checks to a single employee, one of which went to the proper payee, the other of which she misappropriated; (2) payroll checks to terminated and suspended employees, which she misappropriated; and (3) checks for overtime pay that employees did not earn, which she misappropriated.

[12] Under § 3-110(a), the person who signs a check on behalf of the drawer determines to whom the check is payable. Here, Williams stamped the checks with the appropriate signatures, and so she determined to whom they were payable.

15

branch, ensured that the scheme succeeded by cashing the fraudulently indorsed checks. Neither Siemens nor PNC was particularly careful in monitoring its employee's activities, and Williams and Tanner got away with the scheme for quite a while. Eventually, both employers wised up and are now fighting to determine who will bear the loss.

In run-of-the-mill faithless employee scenarios, § 3-404(d) provides:

> [I]f a person paying the instrument or taking it for value or for collection [here, PNC] fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss [Siemens] may recover from the person failing to exercise ordinary care [PNC] to the extent the failure to exercise ordinary care contributed to the loss.

This is a comparative negligence provision. 2 White & Summers, Uniform Commercial Code § 19-2 (4th ed. 1995) (referring to the "comparative negligence" rule in 3-404); *see also* U.C.C. § 3-405 cmt. 4 ("If the trier of fact finds that there was such a failure and that the failure substantially contributed to loss, it could find the depositary bank liable to the extent the failure contributed to the loss."). In other words, when the employer and the bank are both negligent, a trier of fact should apportion the loss between them to the extent each party's negligence contributed to the loss.

Whether § 3-404(d) applies here becomes complicated, however, because Siemens

16

does not allege PNC's actions were negligent, but fraudulent. Specifically, Siemens argues that Tanner's fraud[13] should be imputed to PNC. If Siemens is correct, then § 3-404 does not apply because it only protects banks that pay instruments "in good faith." U.C.C. § 3-404(b)(2). Tanner, of course, did not pay the instrument in good faith, and if we impute her fraud to PNC, it did not either. To determine whether we attribute Tanner's fraud to PNC (and thereby remove this claim from § 3-404's reach), we must look to state agency law, as the UCC does not provide an answer, and the state law on point does not conflict with the UCC's text, purposes, or policies. Hence, I agree with the Court that ordinary principles of agency law apply, and they prevent attributing Tanner's fraud to PNC.

## II.

Having disposed of this case, I write further to note that applying state agency law to claims like this one (which are not uncommon) introduces dissonance into a legal regime that should be uniform and predictable. I suggest that the UCC drafters consider explicitly providing the rules of decision in cases in which the drawer's faithless employee conspires with a bank teller or other line employee.

The symmetry of this case is striking: PNC was negligent in not detecting Tanner's fraud in the same way that Siemens was negligent in not detecting Williams's fraud. Yet, *respondeat superior* threatened to shift liability from Siemens to PNC. In this case, it

---

[13] That Tanner's acts were fraudulent (as opposed to negligent or grossly negligent) is not in dispute.

17

does not matter because New Jersey's version of *respondeat superior* emphasizes whether the employee intended to serve the master. In our case, and in analogous situations, New Jersey (along with many other states) is reluctant to hold a master liable for a servant's fraud when the servant is acting against the master's interests. *See, e.g.*, *J.D. Edwards & Co. v. Podanty*, 168 F.3d 1020, 1024 (7th Cir. 1998) (applying Illinois law); *Am. Bankers Life Assur. Co. of Fla. v. Tri City Bank & Trust Co.*, 677 F.2d 28, 30 (6th Cir. 1982) (applying Tennessee law); *Todd v. Skelly*, 120 A.2d 906, 909–10 (Pa. 1956).

Other states, however, treat these situations differently, holding the master-principal liable so long as the servant-agent, viewed from afar, appears to be about the master's business, even if the putative agent is acting solely for her own benefit. *See, e.g.*, *Dewey v. Lutz*, 462 N.W.2d 435, 443 (N.D. 1990); *Pac. Mut. Life Ins. Co. v. Haslip*, 553 So.2d 537, 541 (Ala. 1989); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 837 (Tex. Ct. App. 1993) ("If an agent is acting within the scope of his *general* authority, his wrongful act, though unauthorized, will nevertheless subject his principal to liability.") (emphasis added) (citations omitted); *Billups Petroleum Co. v. Hardin's Bakeries Corp.*, 63 So.2d 543, 546 (Miss. 1953); *McCarthy v. Brockton Nat'l Bank*, 50 N.E.2d 196, 325–26 (Mass. 1943).

Perhaps more importantly, even in states like New Jersey *respondeat superior* liability turns on the subjective "state of the servant's mind," which, as the Restatement notes, is typically provable only by circumstantial evidence. Restatement (Second) of

18

Agency § 235 cmt. a (1958).  This inquiry is naturally fact-intensive, and in cases involving the same basic facts (faithless employees conspiring to use the checking system to defraud their employers) factfinders can nonetheless reach opposite liability determinations because of differences in nuance and inference.

The same basic situation is treated differently in different states (and can be treated differently by different factfinders in the same state).  While this is a normal and, in some circumstances, salutary effect of our federal-state system, the motivating logic of the UCC is that the law applying to certain commercial transactions should, for efficiency and predictability reasons, be uniform.  *See* Karl N. Llewellyn, *Why We Need the Uniform Commercial Code*, 10 U. Fla. L. Rev. 367, 372 & 381 (1957).  Long ago the UCC drafters (and before them the Negotiable Instruments Law drafters) determined that the banking system and its attendant routine transactions were ripe for standardization.  *Id.*; *see also* Ralph L. Abercrombie, *Article 4: Bank Deposits and Collections*, 15 Okla. L. Rev. 287, 287 (1962).  Following the deregulation of interstate banking in the 1990s, it is more important than ever that the check collection process be governed by rules of decision that do not vary from state to state.

Moreover, it is worth noting that § 3-404 altered the substantive pre-Code law to relieve banks of liability when customers' employees used the check collection system to steal from their employers.  According to White and Summers, the purpose of § 3-404 is to shift liability to employers who fail to take care in supervising employees who control their check-writing:

19

The drafters have concluded that the employer should bear the responsibility for the forgery of certain embezzlers—those who have "responsibility with respect to instruments," i.e., treasurers, payroll clerks, programmers of sensitive computer programs, and the like. *These people are known by the employer to have the keys to the bank.* In some cases they will be bonded. *All employers should have procedures that encourage these people to be trustworthy and that expose them when they are not.*

2 White & Summers § 19-4 (emphasis added). Indeed, the insistence on employer liability is so strong that in a prior version of Article 3 the drawer had no recourse at all against a negligent bank. U.C.C. § 3-405 (1952). In the current version, however, the drafters have recognized that bank negligence could justify a sharing of liability, and so they have provided for comparative negligence. *Id.* When a bank employee is negligent—or even grossly negligent—in cashing the drawer's fraudulently indorsed check, the factfinder apportions liability between the negligent employer and the negligent bank according to well-worn comparative negligence principles.

The UCC's comparative negligence rule should be expanded to cover situations in which both the drawer and the bank have faithless employees because it is inexplicably asymmetric for the applicable rule of decision (UCC comparative negligence or *respondeat superior*) to turn on whether a low-level bank employee was involved in the fraud. At present, if the drawer's faithless employee acts alone, the rule of decision is UCC comparative negligence, but if she acts in concert with a low-level bank employee, *respondeat superior* sometimes shifts liability to the bank alone. At first blush, applying *respondeat superior*, rather than UCC comparative negligence, to such cases might seem

of little moment given that comparative fault is now the preferred approach to all tort liability. *See* Restatement (Third) of Torts: Apportionment of Liability § 1 (2000). Thus, even under a *respondeat superior* rubric, the bank would be able to use the drawer's negligence to limit its liability.

The wrinkle is that the comparative fault inquiries under each approach differ. Under an expanded § 3-404, the jury would compare the conduct of two negligent employers. Under *respondeat superior*, the jury compares the drawer's negligence with the bank's imputed fraud. Comparing negligence to negligence is not the same as comparing negligence to fraud, as intent to harm becomes part of the comparative fault equation. Restatement (Third) of Torts: Apportionment of Liability § 8(b). Indeed, considering the bank employee's intent to defraud could move a jury to impose more liability on the bank than it would were it comparing negligence with negligence.

More important for our case, the UCC provides a three-year statute of limitations. U.C.C. § 3-118(g). In New Jersey (and many other states), statutes of limitations for common-law claims are longer. Indeed, the statute of limitations issue may be the only reason Siemens did not proceed with a UCC claim. Here, Siemens delayed bringing its claim until after the UCC's limitations period had expired; thus, it asserted common-law claims to get around the UCC's time bar. The UCC's limitations period reflects the drafters' decision that employers seeking to shift part of their loss to banks must bring suit within three years. I see no reason for the mere involvement of a teller to change that by providing employers with an "end-around" this limitations period by styling their suits

21

as non-UCC actions.

I do not advocate UCC preemption in the event that the principals of the bank are implicated in a fraudulent scheme. *See Brighton, Inc. v. Colonial First Nat'l Bank*, 422 A.2d 433 (N.J. Super. Ct. App. Div. 1980), *aff'd* 430 A.2d 902 (N.J. 1981). There I agree with the UCC's usual practice of leaving this type of serious commercial fraud to the law of torts. Section 3-404 regulates only low-level fraud by faithless employees because those schemes are common, and they operate through the normal channels of the check collection process. Following that principle, I urge that the UCC extend to reach the not untypical collection problem that arises when both the drawer and the bank have faithless employees. I would not advocate delving into what New York law terms "commercial bad faith," that is, bad faith acts that implicate bank managers with "'actual knowledge'" of the fraud. *See Calisch Assocs., Inc. v. Mfrgs. Hanover Trust Co.*, 542 N.Y.S.2d 644, 645–46 (N.Y. App. Div. 1989) (quoting *Prudential-Bache Sec., Inc. v. Citibank N.A.*, 536 N.E.2d 1118, 1124–25 (N.Y. 1989)).

\* \* \* \* \*

Because I agree that the UCC does not reach the situation presented here, I join the Court's opinion. I, however, urge the UCC drafters to consider redrafting § 3-404 to extend the comparative negligence rule to situations in which a drawer's faithless employee conspires with a teller or other line employee of the bank to cash fraudulent checks.